UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS R. WILLIAMS,

        Petitioner,

v.                              Case No. 08-12182
                                  Honorable Patrick J. Duggan

MILLICENT WARREN,

        Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION AND DENYING A CERTIFICATE OF APPEALABILITY

Petitioner Marcus R. Williams ("Petitioner") has filed a *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his state convictions for home invasion, assault with intent to commit murder, and two counts of possessing a firearm during the commission of a felony (felony firearm).   Respondent Millicent Warren has filed a responsive pleading in which she urges the Court to deny the petition on the ground that the claims lack merit or are not cognizable on habeas review.   The Court agrees.  Accordingly, the Court denies the petition.

## I.  BACKGROUND

### A.  The Evidence

Petitioner was charged in Saginaw County, Michigan with first-degree home invasion, assault with intent to commit murder, and two counts of felony firearm.  The charges arose from a home invasion and shooting at a residence in Saginaw, Michigan on

January 30, 2003.

The evidence at trial established that the homeowner, Tatasha Willis, was at home with Quincy Thomas that evening. At about 11:00 p.m., someone knocked on Willis' front door. She looked out the window and saw a light-skinned man standing at her door. By the time Thomas came to the window and looked outside, the man had walked to the side of the house.

Suddenly, the side door burst open and three men came into the house shouting, "Get down, police." The first man to walk inside was Derrick Braddock, who Willis knew. She did not know the second man, but he was the same man who had been at her front door and she identified Petitioner as that man at trial. Thomas hid in a closet while Willis acquired a gun from her bedroom. She exchanged gunfire with the three intruders and was shot in the leg and back. She retreated to a closet and called 911.

A neighbor called 911 at approximately the same time because she had heard noises and observed two men pulling on the leg and foot of a third person who was in Willis' garage. A police officer dispatched to the scene saw Braddock lying on the ground in Willis' yard. Braddock was unable to move, and he claimed Willis had shot him.

There were three sets of footprints leading from a nearby car to Willis' residence. One set of footprints matched the shoes Braddock was wearing. Subsequent DNA testing on a wine bottle found in the car revealed the presence of two individuals. The DNA type associated with the major donor matched Braddock on twelve of thirteen genetic markers,

and the DNA type associated with the minor donor matched Petitioner on eight of thirteen markers.

After the breaking and entering incident in Saginaw, Petitioner caught a bus to Grand Rapids and stayed with his cousin Tameka Washington and her boyfriend Karl Ray. Ray testified at trial that, a day or two after Petitioner's arrival, Petitioner showed him some gray sweat pants and explained what had happened in Saginaw. Petitioner said that they went to a house to steal a safe containing $20,000. One person went to one door, and the other person went to the other door. They hollered, "Police," and went in. The homeowner shot at them, and he (Petitioner) shot her a couple of times. One man fell and could not get up. They tried to drag him out, but they were unsuccessful because the man was so big. When explaining this incident to Ray, Petitioner wondered whether he could wash the blood out of his pants.

On February 5, 2003, a police officer stopped Ray, Washington, and Petitioner while they were driving in Grand Rapids. Ray initially used a false name to identify himself, but later provided his real name and informed the police what Petitioner had told him about the breaking and entering in Saginaw. As a result of the detailed information Ray provided, the officers sent a message to Saginaw area police departments, asking whether that type of incident had occurred recently. Saginaw police responded that they did have a breaking and entering during which a female homeowner had been shot and that they wished to speak with Petitioner and Ray.

While the Grand Rapids police waited for Saginaw detectives to arrive, they

obtained a search warrant for Ray's residence. One officer found gray jogging pants in a crawl space underneath the house. Subsequent testing of two blood stains on the pants revealed the presence of at least two people. The major donor of DNA material matched Braddock on thirteen of thirteen genetic markers in one stain and twelve of thirteen markers in a second stain. Petitioner could not be excluded as a minor donor of genetic material at two of thirteen markers on the first stain and twelve of thirteen markers on the second stain. Braddock was excluded as the source of DNA material found on a tag and a cutting from the waistband of the pants, but Petitioner could not be excluded as a possible donor of the DNA material at thirteen of thirteen genetic markers.

The police showed an array of photographs, which included one of Petitioner, to Willis. Willis showed an interest in Petitioner's photograph, but could not make a positive identification. Petitioner nevertheless was arrested for the crime, and Ray was arrested as a material witness.

While Petitioner and Ray were housed in the Saginaw County Jail, a "trustee" (inmate) delivered a letter purportedly written by Petitioner to Ray. The letter stated that Petitioner needed Ray to say that he was mistaken when he implicated Petitioner in the crime and that Ray had seen someone else wearing the gray jogging pants. Ray felt threatened by the letter, in part because it said, "This is life or death," and the word "death" was circled. Consequently, Ray was moved to another part of the jail.

Petitioner's girlfriend, as well as her mother and brother, testified at trial that Petitioner was present in their home in Saginaw at the time of the crime. Petitioner's

girlfriend and one of his cousins claimed that the letter given to Ray in jail was not Petitioner's handwriting.

Petitioner testified that he was at his girlfriend's house on the night of the crime. Although he initially informed the police that he was in Grand Rapids when the crime was committed, he claimed at trial that he may have been mistaken about the dates and that he was not involved in the crime. He explained the presence of his DNA on the wine bottle by stating that he had taken a couple of sips of Braddock's drink on January 30. He denied having a conversation with Ray about the breaking and entering incident, and he denied sending a letter to Ray in jail. He also stated that he knew nothing about the crime until he was charged with it and that he had never before seen the gray jogging pants in evidence. According to Petitioner, it was just an unfortunate coincidence that he had been staying at a home in Grand Rapids where the pants with Braddock's blood were found. Defense counsel argued to the jury that Ray's testimony was not credible because Ray had a drug problem, knew too much to be an innocent person, and had a motive for lying in that he wanted Petitioner out of his household.

## B.  The Verdict, Sentence, and Appeals

On March 24, 2004, a Saginaw County Circuit Court jury found Petitioner guilty, as charged, of first-degree home invasion in violation of Michigan Compiled Laws § 750.110a(2), assault with intent to commit murder in violation of Michigan Compiled Laws § 750.83, and two counts of felony firearm in violation of Michigan Compiled Laws § 750.227b.  The trial court sentenced Petitioner to two concurrent terms of two

years in prison for the felony firearm counts, followed by concurrent terms of ten and a half to twenty years for the home invasion, and twenty-two to forty years for the assault. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *People v. Williams*, No. 255876, 2005 WL 3076959 (Mich. Ct. App. Nov. 17, 2005). On April 28, 2006, the Michigan Supreme Court denied Petitioner leave to appeal because the Court was not persuaded that the issues presented merited review. *People v. Williams*, 474 Mich. 1128, 712 N.W.2d 716 (2006).

Petitioner filed a motion for relief from judgment, but the trial court denied his motion, and the Michigan Court of Appeals denied leave to appeal. *People v. Williams*, No. 279392 (Mich. Ct. App. Feb. 1, 2008). Petitioner failed to file a timely application for leave to appeal in the Michigan Supreme Court.

On May 19, 2008, this Court received two habeas corpus petitioner from Petitioner, which the Court filed as one pleading. Petitioner later moved to strike the petition that contained exhausted and unexhausted claims. The Court granted Petitioner's motion and struck pages 13 to 43 of the combined pleading. The remaining issues set forth by Petitioner in support of his request for habeas corpus relief are:

I. Was Petitioner denied his due process right when the trial court refused to instruct on a lesser included offense of assault with intent to murder?

II. Was Petitioner denied a fair trial when the prosecutor cross-examined Petitioner about prior contacts with the police?

III. Was Petitioner denied his right to a speedy trial when Petitioner was tried over a year after his initial arrest?

IV.    Was Petitioner denied his right to have a jury determine all
       sentencing factors at his sentence?

## II.  STANDARD OF REVIEW

Petitioner is entitled to habeas relief only if the state court's adjudication of his

claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court

has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-

13, 120 S. Ct. 1495, 1523 (2000).  A state court's decision is an "unreasonable application

of" clearly established federal law "if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to

the facts of the prisoner's case."  *Id*., 529 U.S. at 413, 120 S. Ct. at 1523.  A federal

habeas court may not "issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly.  Rather, that application must also be

unreasonable."  *Id*., 529 U.S. at 411, 120 S. Ct. at 1522.

## III. DISCUSSION

### A. The Jury Instructions

Petitioner contends that the trial court deprived him of due process by failing to instruct the jury on a lesser-included offense to assault with intent to murder. At trial, Petitioner requested, and was denied, jury instructions on assault with intent to do great bodily harm less than murder and felonious assault. (3/23/04 Tr. at 65-66.) He claims here that there was no direct testimony that he intended to kill Willis.

The Michigan Court of Appeals stated on review of Petitioner's claim that the trial court did not err in refusing to give the requested instruction because such an instruction would not have been supported by a rational view of the evidence. The Court of Appeals also stated that it did not appear that the claimed error was outcome-determinative.

The United States Supreme Court has yet to decide whether the failure to give jury instructions on lesser-included offenses in non-capital cases such as this one violates the right to due process. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14, 100 S. Ct. 2382, 2390 n.14 (1980). "[F]ailure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*)). "[A] Beck instruction is only required when 'there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense,' but not the greater." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (quoting *Hopper v.*

*Evans*, 456 U.S. 605, 610, 102 S. Ct. 2049 (1982)).

This is not a case where the evidence, if believed, could have led the jury to reasonably conclude that Petitioner was guilty of assault with intent to do great bodily harm less than murder or felonious assault, but not assault with intent to commit murder. According to Ray, Petitioner admitted that he fired a gun at the homeowner. The jury was entitled to infer from this evidence that Petitioner intended to kill Willis. *In re Guilty Plea Cases*, 395 Mich. 96, 130, 235 N.W.2d 132, 145 (1975) (finding inference that the defendant intended to kill the victim by the fact that the defendant shot the victim).

Nor is this a case where the element of intent was highly contested. Petitioner's defense was that he was not present during the commission of the crime. An instruction on a lesser-included offense, based on the theory that Petitioner did not intend to kill anyone, would have been inconsistent with the defense that he did not participate in the crime.

For the above reasons, the Court concludes that the trial court's refusal to instruct the jury on lesser-included offenses did not offend federal constitutional standards. Petitioner therefore is not entitled to habeas corpus relief based on this claim.

### B. The Prosecutor

Petitioner alleges next that the prosecutor deprived him of a fair trial by cross-examining him about his prior contacts with the police and by mentioning that he was a member of a gang. Petitioner contends that the prosecutor was attempting to arouse the jurors' prejudices, show that he was frequently accused of wrongdoing, and deflect the

jurors' attention from a reasoned determination of the charges. The Michigan Court of

Appeals held that eliciting information about Petitioner's prior contacts with the police

was proper and that the court was not required to review the reference to gang activity

because Petitioner did not present that issue in his statement of the issues.

### 1. Legal Framework

"Claims of prosecutorial misconduct are reviewed deferentially" by a federal

habeas court. *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on his

claim, Petitioner must demonstrate that the prosecutor's conduct and remarks, taken in the

context of the entire trial, infected the trial with such unfairness as to make the resulting

conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.

Ct. 1868, 1871 (1974). To obtain relief, the prosecutor's conduct must have been

improper and "'so flagrant as to render the entire trial fundamentally unfair.'" *Johnson v.

Bagley*, 544 F.3d 592, 597 (6th Cir. 2008) (quoting *Gillard v. Mitchell*, 445 F.3d 883, 897

(6th Cir. 2006)). Courts consider the following four factors when deciding whether a

prosecutor's improper acts were sufficiently flagrant to warrant reversal: "(1) whether the

evidence against the defendant was strong[;] (2) whether the conduct of the prosecution

tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks

were isolated or extensive; and (4) whether the remarks were made deliberately or

accidentally." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (citing *United States v.

Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

### 2. Reference to the Burt Street Gang

On cross-examination of defense witness Jontoya Williams, the prosecutor asked whether Petitioner and Braddock were associated with "Burt Street." Williams claimed that Braddock was "in Burt Street," but that Petitioner was not. The prosecutor went on to ask Williams whether Petitioner and his girlfriend were shot on Harold Street a few years earlier and whether that had anything to do with Petitioner's association with Burt Street. Williams answered, "No." (3/19/04 Tr. at 120-21.)

The prosecutor did not mention the word "gang," and even if the jury assumed that the prosecutor was discussing gang activity, Williams maintained that Petitioner was not associated with Burt Street. She claimed that Petitioner associated with her brothers, Jamar and Jamel Williams. (*Id*. at 114-15, 120-21.)

Although the prosecutor deliberately elicited the disputed testimony, the issue did not come up again, and the evidence against Petitioner was substantial. The Court therefore finds that the prosecutor's questions about gang-related activity did not amount to flagrant conduct, even assuming that his questions were improper.

### 3. Prior Contacts with the Police

Petitioner admitted on direct examination that he initially lied to the police about his whereabouts on the night of the crime. He went on to explain that he may have been confused about the date, that he was nervous when talking to the police, and that he was not used to having two police officers talking at the same time and asking a hundred questions. (*Id*. at 129-30.) On cross-examination, the prosecutor asked Petitioner whether it was true that he was not used to talking to police officers and whether he had

11

previously talked to the police about an accusation. The trial court overruled defense counsel's objection to the prosecutor's questions because Petitioner opened the door to the inquiry. The prosecutor then continued his line of questioning by asking whether Petitioner had prior contact with police in cases other than this one, whether Petitioner had dealt with police officers on more than one occasion, and whether he had a little more experience with the police than most people. (*Id*. at 148-49.)

During closing arguments, the prosecutor stated that Petitioner had lied to the jurors when he said that he was not used to being around police officers. The prosecutor also said that Petitioner "has had plenty of experience with police. He wasn't at all thrown off base or didn't . . . have a chance to think." (3/23/04 Tr. at 9.)

"It is unprofessional for counsel to express a personal belief or opinion in the truth or falsity of any testimony." *United States v. Collins*, 78 F.3d 1021, 1039-40 (6th Cir. 1996). "On the other hand, counsel must be given leeway to argue reasonable inferences from the evidence. Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *Id*. at 1040.

It was reasonable for the prosecutor to infer that Petitioner lied when he implied that he lacked experience talking with the police, because he apparently did have prior contacts with the police. And even though the prosecutor's questions and comments were deliberately made, they were not misleading. Petitioner ultimately admitted that he had prior contact with the police, and he explained that he had been on edge when questioned in this case and that he normally did not approach police officers to talk with them. There

was no mention of any crimes that Petitioner may have committed or was accused of, and the evidence against him was substantial.  Given the strength of the evidence against Petitioner and the "stringent standards applicable on habeas review," *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000), the prosecutor's questions and remarks about Petitioner's prior contacts with the police did not amount to flagrant conduct.  Petitioner therefore is not entitled to habeas corpus relief based on his prosecutorial misconduct claim.

### C.  The Right to a Speedy Trial

Petitioner alleges next that he was denied his constitutional right to a speedy trial because he was tried over a year after his arrest.  The Michigan Court of Appeals concluded on review of this claim that Petitioner was not prejudiced by the delay and that his right to a speedy trial was not violated.

Petitioner possessed a constitutional right to a speedy trial under the Sixth Amendment to the United States Constitution.  *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 2184 (1972).  Pursuant to *Barker*, "a court should consider four factors in analyzing whether a defendant's right to a speedy trial was violated:  length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Girts v. Yanai*, 600 F.3d 576, 587-88 (6th Cir.  2010) (citing *Barker*, 407 U.S. at 530, 92 S. Ct. at 2182), *petition for cert. filed*, No. 10-39 (U.S. June 28, 2010).

### 1.  Length of the Delay

"The length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the

other factors that go into the balance." *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192. As the

Sixth Circuit has provided regarding this factor:

> If the length of the delay is not "uncommonly long," then judicial
> examination ends. *Doggett v. United States*, 505 U.S. 647, 652, 112 S. Ct.
> 2686, 120 L.Ed.2d 520 (1992). The length of the delay is measured from
> the date of the indictment or the date of the arrest, whichever is earlier.
> *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 30 L.Ed.2d 468
> (1971); *Redd v. Sowers*, 809 F.2d 1266, 1269 (6th Cir. 1987). A delay
> approaching one year is presumptively prejudicial and triggers application
> of the remaining three factors. *Doggett*, 505 U.S. at 652 n.1, 112 S. Ct.
> 2686.

*Maples v. Stegall*, 427 F.3d 1020, 1025-26 (6th Cir. 2005).

The Michigan Court of Appeals calculated the delay from arrest to trial as 396

days. Because the delay was thirteen months, or more than a year, it was presumptively

prejudicial under the Sixth Amendment and the Court must evaluate the other three

factors.

## 2. Reason for the Delay

The reason for the delay was partly Petitioner's fault and partly the prosecutor's

fault. The Michigan Court of Appeals determined that Petitioner caused 175 days of

delay and that the prosecutor caused 70 days of delay requesting adjournments of the trial

date. The remaining 151 days of delay was the result of inherent delays in the court

system and thus the Court of Appeals attributed that delay to the government.

The United States Supreme Court has stated with regard to the different causes for

delay:

> . . . different weights should be assigned to different reasons. A deliberate

14

attempt to delay the trial in order to hamper the defense should be weighted
heavily against the government. A more neutral reason such as negligence
or overcrowded courts should be weighted less heavily but nevertheless
should be considered since the ultimate responsibility for such
circumstances must rest with the government rather than with the defendant.

*Barker*, 407 U.S. at 531, 92 S. Ct. at 2192 (footnote omitted).

There is no indication in this case that the prosecution deliberately delayed

Petitioner's trial for the purpose of hindering his defense. Therefore, the 221-day delay

attributable to the prosecution due to requests for adjournments and inherent delays in the

court system should not be weighed heavily. However, because the prosecution was

responsible for more of the delay than Petitioner, the reason for the delay tips slightly in

Petitioner's favor.

### 3. Assertion of the Right

The record reflects that Petitioner asserted his speedy trial rights in a motion to

dismiss filed in December 2003, ten months after his arrest. The Sixth Circuit Court of

Appeals has held that a defendant's unexplained four-month and three-week delay in

asserting his speedy trial rights weighed against him. *United States v. Schreane*, 331 F.3d

548, 557 (6th Cir. 2003); *see also United States v. Watford*, 468 F.3d 891, 907 (6th Cir.

2006) (weighing against the defendant his nearly five-month delay in asserting his speedy

trial rights). Thus Petitioner's ten-month delay in asserting his speedy trial rights causes

this factor to be weighed against him.

### 4. Prejudice

The remaining factor is prejudice caused by the delay. "A showing of prejudice is

required to establish a violation of the Sixth Amendment Speedy Trial Clause." *Reed v. Farley*, 512 U.S. 339, 353, 114 S. Ct. 2291, 2299 (1994).  Delay may cause varying types of prejudice:

> [U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence.  *Barker*, 407 U.S., at 532, 92 S.Ct., at 2193; see also *Smith v. Hooey*, 393 U.S. 374, 377-379, 89 S.Ct. 575, 576-578, 21 L. Ed. 2d 607 (1969); *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L. Ed. 2d 627 (1966).  Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U.S., at 532, 92 S.Ct., at 2193.

*Doggett v. United States*, 505 U.S. 647, 654, 112 S. Ct. 2686, 2692 (1992).

Petitioner alleges that the delay impaired his defense.  Specifically, he claims that he was unable to produce two witnesses who would have impeached Karl Ray's testimony that Petitioner wrote to him in jail and asked him to change his story.  Petitioner asserts that his attorney was unable to locate "Mr. Jenkins," who supposedly delivered the letter to Ray, and Willie Chandler,[1] who Petitioner claims would have testified that he heard Ray admit to fabricating the letter.

Petitioner has not produced any affidavits from Jenkins or Chandler, nor demonstrated that Jenkins or Chandler would have been available if he had been tried sooner.  Although the trial court appointed an investigator to assist Petitioner in April of

---

[1]Petitioner refers to this person as "Willie Chadler," but the state record indicates that the person's surname is Chandler.

2003, the Michigan Court of Appeals determined that neither of these witnesses was ever included on Petitioner's witness lists.

Furthermore, Petitioner appears to allege that it was the trial court's mid-trial ruling on the admissibility of the jailhouse letter that contributed to the witnesses' unavailability. According to Petitioner, the trial court initially ruled that the letter was inadmissible, but subsequently ruled that the letter was admissible. Petitioner contends that defense counsel relied on the trial court's initial ruling and assumed that the witnesses were not needed.

Attributing the unavailability of the witnesses to the trial court's ruling is different from attributing their unavailability to delay in the trial. The record, moreover, indicates that the trial court did not change its mind about the admissibility of the jailhouse letter. Instead, the court agreed to listen to arguments and rule on the issue after the prosecutor laid a proper foundation and was ready to introduce the evidence. (3/12/04 Tr. at 13-14.)

Later that same day, the prosecutor conducted his direct examination of Karl Ray. When he started to ask Ray about his arrest as a material witness, defense counsel objected to the prosecutor's attempt to introduce the letter that Petitioner supposedly sent to Ray while the two of them were in jail. The trial court then excused the jury, listened to the parties' arguments, and permitted Ray to testify on a separate record. Defense counsel blamed the prosecution for not producing Jenkins (*id*. at 88), and at the conclusion of the separate record, the court ruled that the letter was admissible. (*Id*. at 99-101.) When the jury returned to the courtroom, the prosecutor elicited testimony

about the letter.  (*Id*. at 102-07.)

Even if the failure to produce Jenkins and Chandler were the result of the delay in trying Petitioner, the two men were not key witnesses.  They would have been limited to testifying about whether Petitioner wrote the jailhouse letter and arranged to have it delivered to Ray.  Jenkins and Chandler would not have been able to refute Ray's testimony regarding Petitioner's admissions to him in Grand Rapids before he and Petitioner were arrested.

Furthermore, Ray's testimony was not the only incriminating evidence against Petitioner.  The victim identified Petitioner as one of the three armed intruders, and DNA evidence linked Petitioner to the crime.

In short, even if the delay in Petitioner's trial was the cause of his inability to call Jenkins or Chandler as witnesses– an assertion which is questionable– the Court concludes that their testimony had limited value and that their unavailability did not seriously prejudice Petitioner's defense.

### 5.  Summary

The delay was more than a year, and although Petitioner asserted his right to a speedy trial and was less at fault for the delay than the prosecutor, counter-balancing factors outweigh the deficiencies.  Petitioner did not assert his speedy trial rights until ten of the thirteen months elapsed.  Additionally, the delay was not uncommonly long by Supreme Court standards.  The Supreme Court found no violation of the right to a speedy trial in *Barker* even though the delay in Barker's case was more than five years.  The

Supreme Court did find a violation of the right to a speedy trial in *Doggett,* but the delay there was eight and one-half years, much longer than the delay in this case. Furthermore, Petitioner was responsible for forty-four percent of the delay, and the delay attributed to the prosecution cannot be weighed heavily against it due to the absence of bad faith and the fact that some of the problem was the result of inherent delay in the court system.

Petitioner, moreover, has not shown that he was seriously hampered in presenting his defense due to the delay. The unavailability of the two witnesses he mentions is not clearly attributable to the delay, and their testimony would not have exculpated Petitioner.

The Court concludes that, on balance, the four factors tip in favor of the prosecution. The state court's determination – that Petitioner's right to a speedy trial was not violated – did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent. Consequently, Petitioner is not entitled to relief on the basis of his third claim.

### D. The Sentence

In his fourth and final habeas claim, Petitioner alleges that he was denied his right to have a jury determine all of the facts used to score his sentencing guidelines range with respect to his assault with intent to murder and home invasion convictions. This claim is based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 2362-63 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). The Supreme Court held in *Apprendi* that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. The "statutory maximum" for purposes of *Apprendi* "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537 (emphasis omitted).

The Michigan Court of Appeals rejected Petitioner's claim because "a majority of the Justices of [the Michigan] Supreme Court in *People v. Claypool*, 470 Mich. 715, 730 n.14; 684 N.W.2d 278 (2004), stated that *Blakely* does not affect guidelines scoring in Michigan to set a defendant's minimum sentence." *Williams*, 2005 WL 3076959, at *3. And the United States Court of Appeals for the Sixth Circuit has held that "*Apprendi's* rule does not apply to judicial factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum." *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (explaining *Harris v. United States*, 536 U.S. 545, 122 S. Ct. 2406 (2002)), *cert. denied*, __ U.S. __, 130 S. Ct. 3413 (2010).

Petitioner's sentence did not exceed the statutory maximums for his crimes. The maximum prison sentence for first-degree home invasion is twenty years, Michigan Compiled Laws § 750.110a(5), and the maximum sentence for assault with intent to commit murder is life imprisonment, Michigan Compiled Laws § 750.83. Petitioner was sentenced to ten and a half to twenty years for home invasion and twenty-two to forty years for assault. Therefore, his sentence does not violate the Sixth Amendment right to have the jury make factual determinations.

Petitioner claims that the Court should apply *Blakely* because Michigan has a

determinate sentencing scheme like the one under consideration in *Blakely*.  Thus, according to Petitioner, his sentencing guidelines range should be reduced from 171-285 months to 81-135 months for assault with intent to commit murder and reduced from 78-130 months to 36-60 months for first-degree home invasion.

Both the Michigan Supreme Court and the United States Court of Appeals for the Sixth Circuit have described Michigan's sentencing scheme as indeterminate.  *See Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010); *People v. Drohan*, 475 Mich. 140, 161, 715 N.W.2d 778, 790 (2006).  The Court therefore finds no merit in Petitioner's argument that Michigan has a determinate sentencing scheme.  He has no federal constitutional right to a lesser sentence.

## IV.  CONCLUSION

For the reasons set forth above, the Court hold that the state appellate court's rejection of Petitioner's claims did not result in a decision that was contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.

Accordingly,

**IT IS ORDERED**, that Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**;

**IT IS FURTHER ORDERED**, that a certificate of appealability is **DENIED** because reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong, nor conclude that the issues are adequate to deserve encouragement

to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1604

(2000). Petitioner nevertheless may proceed *in forma pauperis* on appeal because an

appeal from this decision could be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R.

App. P. 24(a)(4)(B).

DATE:October 18, 2010                    s/PATRICK J. DUGGAN
                                         UNITED STATES DISTRICT JUDGE


Copies to:
Marcus Raydevan Williams
#439924
Marquette Branch Prison
1960 U.S. Hwy. 41 South
Marquette, MI   49855

AAG Laura A. Cook